THE STATE, EMILY W. ROEBLING, PROSECUTRIX, PLAINT-
IFF IN ERROR, v. THE TRENTON PASSENGER RAIL-
WAY COMPANY (CONSOLIDATED) AND THE BOARD OF
PUBLIC WORKS OF THE CITY OF TRENTON, DEFEND-
ANTS IN ERROR.

1. The act of 1893 (*Pamph. L.*, p. 241, §§ 1, 2) empowered city authorities, by ordinance, to authorize street railroad companies to substitute electric motors in the place of horses, as the propelling power of their cars, and to authorize the use of poles in the streets, with wires thereon to supply the motors with electricity, and to prescribe the places in

which such poles should be located. The act did not confer on the companies any rights beyond those vested in them by their charters, except in allowing a change in the motive power to be applied to their cars. *Held*, that such ordinance did not, *per se*, create an additional easement.

2. The act did not confer on the companies the right to acquire private property by the exercise of the right of eminent domain, but only the right to erect poles and use the trolley system, so far as the public easement was concerned, with a view to the public convenience in the use of the street, leaving the several companies, if their necessities or convenience require the appropriation of private property, to obtain the consent of the landowners by agreement.

3. If the acts done under color of the statute, or of an ordinance passed under it, be found to be an unlawful invasion of the rights of private property, an action will lie in which neither the statute nor the ordinance would be a justification.

On error to the Supreme Court.

For the plaintiff in error, *Charles E. Gummere* and *William M. Lanning.*

For the defendants in error, *Joseph Coult* and *James Buchanan.*

The opinion of the court was delivered by

DEPUE, J.   This writ brings up a judgment of the Supreme Court sustaining an ordinance entitled "An ordinance to authorize the Trenton Passenger Railway Company (Consolidated) to use electric motors as the propelling power of its cars through certain streets and avenues in the city of Trenton, and to provide for the erection of poles and the stringing of wires thereon to supply electricity to the motors," passed by the board of public works of the city of Trenton, February 8th, 1894, and approved by the mayor, February 12th, 1894.

The ordinance was passed in virtue of the act of 1893. *Pamph. L.*, p. 241 ; *Gen. Stat.*, p. 3210.

The first section of that act authorizes street or horse railroad companies to use electric motors as the propelling power of their cars instead of horses, provided consent of the municipal authorities be first obtained.

The second section empowers the municipal authorities to authorize the use of poles, to be located in the public streets, with wires, &c., for the purpose of supplying the motors with electricity, and to prescribe the manner in which and the places where such poles should be located.

The ordinance is, in all respects, in compliance with this statute, so far as is material to this case, and is in conformity with the powers of the city government to regulate the use of public streets.

The prosecutrix is the owner of a lot on the southerly side of West State street, between Warren and Calhoun streets. Her title extends to the middle line of the street, subject to an easement in the public for the purposes of a public highway.

The reasons filed for setting aside this ordinance are :

*First.* Because the erection of poles and the stringing of wires thereon upon the lands of the prosecutrix, in West State street, in the city of Trenton, for the purpose of supplying electricity to the motors to be used by the Trenton Passenger Railway Company (Consolidated) in propelling their cars over and along their railroad in said city, without the consent of the said prosecutrix, and without payment to her therefor, is in violation of the constitution of the State of New Jersey, in that it is a taking of private property for public use by a private corporation without compensation first made to said prosecutrix ; and, therefore, an ordinance authorizing the erection of such poles and the stringing of wires thereon for such purpose, without providing for compensation for land taken, is illegal and void.

*Second.* Because the construction and operation of an electric railroad in the public streets in Trenton, upon the lands of the prosecutrix therein, without her consent and without payment to her therefor, is in violation of the constitution of the State of New Jersey, in that it is a taking of private property for public use by a private corporation without compensation first made to the said prosecutrix ; and, therefore, an ordinance authorizing the construction and operation of such a railroad,

without providing for compensation for land taken, is illegal and void.

*Third.* Because the said ordinance is unreasonable, so far as it authorizes and permits the construction and operation of a double-track electric railway, to be operated by what is known as the trolley system, upon West State street, between Warren and Calhoun streets, in the city of Trenton.

The ordinance, in prescribing the places in which the company's poles should be located, fixed the location of two of its poles on the sidewalk in front of the property of the prosecutrix, just inside of the curb line, and the company has erected these two poles at the places indicated. The evidence shows that the cars used by the company weigh seven and one-half tons, and are thirty feet in length, and that ordinary horse cars weigh one and one-half tons and are fourteen feet in length; and that the speed with which the company runs its cars in the section of the street on which the property of the prosecutrix is located, is from seven and one-half to seventeen miles per hour, with a mean average speed on the forty-six trips observed of twelve miles per hour. There is also evidence in the depositions that by reason of the weight of the cars and the speed at which they are run, they occasion, at times, vibrations to the extent of rattling the windows in the dwellings fronting on the street.

The prosecutrix's standing in this proceeding is that of the owner of property complaining of an invasion of her property rights. The ordinance being in compliance with the statute, the question is, whether the act of 1893 is within the power of the legislature.

In considering this question, it must be admitted at the outset that the transmission of passengers with increased speed and greater comfort is a great public benefit. This is equally true of the lines of railroads that traverse our state and penetrate into every section, and of the diversion of waters to create waterways for carrying freight, or to supply water for use in the large cities and towns. It is also conceded that the erection of poles, with wires strung thereon, in the present

state of the sciences, is necessary to accomplish the purposes contemplated by this legislative provision. But no considerations of public advantage should be permitted to predominate over the rights of private property which, by a constitutional inhibition, cannot be taken for a public use without compensation.

As was said by Chancellor Green, in *Hinchman* v. *Paterson Horse Railroad Co.*, 2 C. E. Gr. 75, 80: "Nothing can be claimed on the ground that city railroads are a great public convenience and benefit; if they are so, the public can afford to pay for it; that is certainly no reason why individual property should be taken for public use." This constitutional provision has uniformly been liberally construed for the protection of private property. Not only an actual taking, but also the destruction of private property, either total or partial, or the diminution of its value by the act of the government, directly and not merely incidentally affecting it, which deprives the owner of the ordinary use of it, is a taking within the constitutional provision which can only be exercised under the right of eminent domain, on just compensation made. *Trenton Water Power Co.* v. *Raff*, 7 *Vroom* 335; *Pennsylvania Railroad Co.* v. *Angel*, 14 *Stew. Eq.* 316, 329.

The title to the soil over which highways and streets are laid remains in the owner of the fee, subject only to the public easement. "The rights of the public in a highway," said Chief Justice Beasley, in *State* v. *Laverack*, 5 *Vroom* 206, "consists in the privilege of passage, and such privileges as are annexed as incidents by usage or custom, as the right to make sewers and drains and lay gas and water-pipes; these subordinate privileges are entirely consistent with the primary use of the highway and are no detriment to the landowner." This principle has been extended to the use of streets in populous districts, to appliances for distributing water, light, heat, power and matters of general necessity or convenience. *Lew. Em. Dom.*, § 126. In *Stoudinger* v. *Newark*, 1 *Stew. Eq.* 187; *S. C., Id.* 446, it was held, against the landowner's objection, that the use of the street for sewers was a legitimate

use, consistent with the purpose for which the land was appropriated. The uses of the streets for such and similar local and public benefits, have, from an early period in municipal governments, been so usual and customary, as that they may be regarded as having been in contemplation when the streets were laid out or dedicated as servitudes upon lands within and abutting upon streets, to be put in force as occasions arise for their use, which confer a benefit immediately upon the adjacent lands. But it is not every use of a public street that is lawful as against the rights of the owner of the fee, though such use may promote public benefit. Thus, it was held in State *v.* Laverack, that the legislature had not the power, under the constitution of this state, to authorize a market to be held in a public street of a city without providing compensation to the proprietors of the contiguous lands who owned to the centre of such street, notwithstanding that such market was designed for public use and enured to a public benefit. In *Starr* v. *Camden and Atlantic Railroad Co.,* 4 *Zab.* 592, the subject was discussed by Mr. Justice Haines, who explicitly held that the constitution of this state prevented the legislature from granting to a railroad the right to use a public highway as the bed of its railroad without compensation to the owner of the soil, and his opinion on that head has uniformly and frequently been adopted as a correct exposition of the constitutional right of the owner of the soil within public highways. In both the cases cited, the prosecution was at the instance of the owner of abutting lands, whose title extended to the centre line of the highway.

In *Hinchman* v. *Paterson Horse Railroad Co.,* 2 *C. E. Gr.* 75, the power of the legislature to authorize the use of a public street for street railways was directly under consideration. The bill was filed by owners of lots abutting upon the street, having title to the middle of the street, to enjoin a horse railroad company from the construction of its railroad through the street under the authority of its act of incorporation. Chancellor Green, in his opinion, quoted with approbation the opinion of Mr. Justice Haines in Starr *v.* Camden and At-

lantic Railroad Co., and affirmed the incapacity of the legislature, under our constitution, to appropriate lands within public highways to any other than their legitimate use as highways, without compensation to the owners of the soil. The learned Chancellor distinguished the use of a street for a horse railroad from its use by an ordinary railroad, and justified the use of part of the highway for street railroads in this language : " They are ordinarily, as in this case, required to be laid level with the surface of the street, in conformity with existing grades. No excavations or embankments to affect the land are authorized or permitted. The use of the road *is nearly* identical with that of the ordinary highway. The motive power is the same. The noise and jarring of the street by the cars is not greater, and ordinarily less than that produced by omnibuses and other vehicles in ordinary use. Admit that the nature of the use, as respects the traveling public, is somewhat variant, how does it prejudice the landholder ? Is his property taken ? Are his rights as a landholder affected ? Does it interfere with the use of his property any more than an ordinary highway ? " It will also be observed that the Chancellor, in his subsequent language, expressly repudiated the idea that the rights of landowners in the premises could be affected by the fact that city railroads were a great public convenience.

The extract made from the opinion of the learned Chancellor has frequently been referred to with approval by the courts of this state. The ground of the Chancellor's decision denying the injunction was, that the complainants' rights as owners of lands were not in fact prejudiced or interfered with by the use of the streets by a street railroad, operated in the manner in which the railroad in question was authorized to be operated, to a greater degree than they would be affected by their use as an ordinary highway ; in other words, that the mode in which the company was authorized by its charter to use the streets of the city in fact created no additional servitude upon the lands.

The defendant was incorporated as a " horse railroad com-

pany," with power to lay rails and operate a railroad through Clinton and State streets, in the city of Trenton. *Pamph. L.* 1859, *p.* 266. The act of 1893, and the consent of the city authorities by the ordinance, authorized the company to substitute electric motors in the place of horses as the propelling power of its cars. Neither the statute of 1893 nor the ordinance conferred upon the company any rights beyond those vested in it by its charter, except in allowing a change in the motive power to be applied to its cars. The change in the motive power of the cars did not necessarily occasion any injurious effects upon the prosecutrix's property. Cars of the same pattern and size of the cars used by the company as a horse railroad, and driven with no greater speed, might have been adapted to the new motive power. I agree with those cases in our courts which hold that the substitution of electric motors with the trolley system for horses on street railroads does not, *per se,* create an additional easement. The injury to property which would give the prosecutrix a legal ground of complaint does not spring from the kind of motors used.

The statute also empowers the municipal authorities to authorize the use of poles in the streets, with wires thereon to supply the motors with electricity, and to prescribe the places in which such poles should be located. Two of these poles were located by the ordinance on the complainant's lands, on the sidewalk, inside of the curb. Holes were dug and poles were set in the ground by the company at the places indicated by the ordinance.

The contention of the prosecutrix is that the setting of these poles on her lands constituted a permanent, exclusive and continuous use of her lands not within the customary and legitimate use of the lands of abutting owners on a public way, and was to that extent a taking of private property such as is interdicted by the constitution except upon just compensation made; and that an ordinance authorizing the erection of poles and the stringing of wires thereon for the purpose of supplying the company's motors with electricity, without providing for land taken, is illegal and void.

The statute which underlies this ordinance does not confer upon these companies the right to acquire private property by the exercise of the right of eminent domain. By that act the legislative purpose was to confer upon these companies the right to erect poles and use the trolley system, so far as the public easement was concerned, and made it the duty of the municipal government to fix and designate the location of the poles with a view to the public convenience in the use of the streets, leaving the several companies, if their necessities or convenience require the appropriation of private property, to obtain the consent of landowners by agreement. In withholding the power of eminent domain, the legislature intended that if private property was necessary or desirable, these companies should acquire rights in private property by the consent of the owners, and not take it *in invito*. The act, in withholding the power of condemnation, may not effectuate all that these companies in particular instances desire for the scheme of improvement they have embarked upon; but the act, by its imperfection in this respect, is not rendered wholly void.

Injuries by vibrations caused by the weight of the cars of the company, combined with the speed at which they were run, belong to the same class of injuries as that which may arise from the setting of poles. The owner of lands abutting upon a street holds his title subject to the inconveniences and injurious consequences, including those occasioned by noise and vibration, resulting from a user which is consistent with the legitimate and proper use to which these public thoroughfares are devoted. But such injuries as are caused by a manner or mode of user which is not justifiable, on the ground that the *locus in quo* is a public street, will lay the foundation for and are redressible by action. In *Beseman* v. *Pennsylvania Railroad Co.*, 21 *Vroom* 235; *S. C.*, 23 *Id.* 221, the immunity of a corporation exercising public franchises from liability for incidental damages occasioned to abutting lands, was limited to such damages as were occasioned by the exercise of its franchises with care and skill in all respects. Neither the act of 1893 nor the ordinance under review pur-

ported to legalize the size or weight of cars to be provided by the company, nor the speed at which they should be run. The privileges granted were capable of being enjoyed without an excessive or unusual injury to lands abutting upon the streets.

If any of the privileges granted by this statute are made the occasion for unlawfully injuring the owners of abutting property, such acts of the company are *ultra vires* and redressible by action at the suit of the injured party.

The act of the legislature is a general law for the equipment of street railways throughout the state, and the ordinance under review is, in those respects which are material to this controversy, similar to the ordinances under which many street railways have been equipped and are operated. A decision that such ordinances and the statute under which they were made were invalid, for the reason that, in a particular case before the court, it should appear that these privileges have been made the occasion for unlawfully injuring private property, when such injury was not the direct product of the ordinance, would be disastrous to public interests and not warranted in law. For such injuries, the remedy of the party injured is by action. If the acts done under color of the ordinance, or the statute be found to be an unlawful invasion of the rights of private property, an action will lie in which neither the ordinance nor the statute would be a justification. *Costigan* v. *Pennsylvania Railroad Co.*, 25 *Vroom* 234, 239, 240.

The remaining reason assigned for setting aside this ordinance is that it is unreasonable, so far as it authorizes and permits the construction and operation of a double-track railway to be operated by the trolley system upon West State street, between Warren and Calhoun streets. The title of the ordinance relates solely to the use of electric motors, and the erection of poles with wires thereon to supply electricity to the motors. The permission granted to the company is to use their motors and appliances " on its tracks which are hereby authorized to be laid," enumerating certain streets, among which is State street, from the easterly limits to the

westerly limits of the city. The ordinance recognizes double and single tracks, which were probably laid under the authority of the company's original charter. Be that as it may, nothing appears in the case to show that there is anything in the situation of West State street, either in its width or surroundings, that makes a double track in the street, with cars operated by the trolley system, in itself injurious or unreasonable, either with respect to the public convenience or to private property. Nor does it appear that the track of the company's railroad, next to the property of the prosecutrix, has been placed so near the curb line as unreasonably to interfere with access to her property, or the enjoyment of those privileges which owners of abutting lands are entitled to enjoy in a public highway in front of their premises.

The ordinance, in its second section, reserves to the board of public works the right to make reasonable regulations governing, among other things, the number of cars in a train ; and in the sixth subdivision of the nineteenth section, trail cars are mentioned. Under these sections the company appears to claim a right to run trains made up of a motor car and one or more connected passenger cars called trailers. Trains so made up were run during the state fair as through trains to the fair grounds, with instructions to the company's employes not to carry local passengers. It may be difficult to justify such a use of the streets upon the theory upon which the use of streets for street railways has been justified as a legitimate use. But there is no reason assigned which brings this part of the ordinance under review.

Finding no infirmity in the ordinance, or in the statute in virtue of which it was passed, within the reasons assigned for setting aside the ordinance, I think the judgment of the Supreme Court sustaining it should be affirmed.

*For affirmance*—THE CHANCELLOR, DEPUE, DIXON, LIPPINCOTT, LUDLOW, BARKALOW, BOGERT, HENDRICKSON, NIXON.    9.

*For reversal*—None.