HENRY G. OPDYCKE, PLAINTIFF IN ERROR, v. PUBLIC
SERVICE RAILWAY COMPANY, DEFENDANT IN ERROR.

Submitted December 6, 1909—Decided June 20, 1910.

1. Evidence reviewed, and *held* not to warrant a nonsuit for contributory negligence.
2. When a highway is laid out of a certain width the entire width
becomes subject to the public easement of passage ; if a less width
is graded and worked for travel, or if a bridge or culvert does not
extend to the entire width, the public rights of passage are not
thereby limited in favor of one who places an unauthorized or
improper structure within the highway limits.
3. One who places an unauthorized obstruction within the limits of
the highway as laid out is liable to an action at the suit of any
person who is specially damnified thereby, and this although the
obstruction be outside the traveled way.
4. Consent granted to a traction company under *Pamph. L.* 1893, *p.*
302 (*Gen. Stat., p.* 3235), for the construction, maintenance and
operation of a street railway along certain streets and highways,
does not warrant the construction and maintenance, within the
limits of the highway, of a bridge for the accommodation of the
tracks that in design and construction is dangerous to ordinary
travel and calculated to entrap and kill horses and other animals
that may attempt to pass over it.
5. The fact that a horse is running beyond control when he is injured because of an unlawful and improper structure in the highway (the runaway not being attributable to plaintiff's negligence),
does not debar the plaintiff from his action against the party
maintaining the structure.

On error to the Supreme Court.

For the plaintiff in error, *Edward P. Johnson.*

For the defendant in error, *Alvah A. Clark.*

The opinion of the court was delivered by

PITNEY, CHANCELLOR. Plaintiff sued to recover damages
for the death of his horse, occasioned, as alleged, by the wrongful conduct of the defendant company in maintaining within
the limits of a certain public highway in the county of Som-

erset a certain bridge with its approaches that were improperly constructed and insufficiently guarded, and unfit and unsafe for the use of horses.

Plaintiff's horse was running away at night, without a driver, when it went upon the bridge in question, and because the bridge was not suited to the use of horses and vehicles, but was arranged for carrying a trolley railway only, and had open spaces between the cross-ties, the horse's feet got between the ties and his legs were broken, causing his death.

Plaintiff was nonsuited at the trial upon two grounds—*first,* that the bridge, while within the highway limits, was outside of the traveled way, and *second,* that the plaintiff was guilty of contributory negligence. The present writ of error is brought to review the judgment of nonsuit.

We will first dispose of the second ground upon which the decision below was rested. In the view of the trial judge the plaintiff was indisputably negligent in causing or permitting his horse, on the occasion in question, to be attached to a carriage with a broken shaft, the consequence being, as the learned judge thought, that the shaft fell from the tug and excited the horse, causing the runaway. An examination of the evidence convinces us that there is no other theory upon which a nonsuit for contributory negligence can with any degree of plausibility be defended, and we therefore content ourselves with discussing the view adopted by the trial judge.

It appears that plaintiff and his wife were driven in the early part of an evening in March from their residence in Finderne to the house of a friend in Bound Brook, where they dined and spent the evening. Plaintiff's coachman drove them, using a single horse and a carriage belonging to the plaintiff. According to the evidence, the horse was a spirited but not a vicious animal. About ten o'clock in the evening the coachman, in preparation for the return journey, backed the horse out from the shed under which he had stood tied, and in backing him accidentally broke the plaintiff's carriage, rendering it for the time unfit to be used. The plaintiff, being informed of the mishap, applied at a neighboring livery stable for a carriage to be hired for the occasion. The coach-

man was present at the time, but plaintiff appears to have personally attended to the arrangements with the livery stablemen. He testified that they at first offered him a wagon having no lights, which he rejected; they then offered him another, which had a short piece broken from the end of one shaft, but they said this did not interfere with its efficiency; this wagon likewise he declined to take, telling the men that he wanted a perfectly safe vehicle. At this juncture he returned to the house where Mrs. Opdycke awaited him, leaving the coachman at the stable to bring the horse and carriage when made ready. The coachman followed him soon afterwards, driving the horse, and, attached to it, a wagon procured from the livery stable, which in fact had a piece five to eight inches in length broken from the end of one of the shafts. According to the plaintiff's testimony, as we understand it, he did not know that the wagon furnished to him was thus broken until after the runaway. The coachman testified that he knew before he took the horse and wagon from the livery stable that the hired carriage had a shaft from the end of which a piece was broken, but that he observed at the same time that six inches of the shaft still projected from the tug. When the coachman brought the horse and the hired vehicle to the door of the house where Mr. and Mrs. Opdycke were waiting, the horse appeared so restive that Opdycke's attention was attracted, and he discovered that the shaft had dropped from the tug. By his direction the coachman at once drove back to the livery stable, Opdycke himself hurrying there on foot. He called the stablemen and directed one of them to take hold of the horse's head while the coachman should get out and correct the difficulty. One of the stablemen accordingly took the horse's head, the coachman got out, and he with the aid of the other stablemen was endeavoring to right matters, and at this juncture the horse reared slightly, broke loose from the man who was holding him, and ran away towards home, with the result already mentioned.

Of course, if the plaintiff did not knowingly accept the carriage with the broken shaft (and so we interpret his testimony, which is the only evidence upon the subject), he is not per-

sonally chargeable with negligence in this regard. It is insisted by counsel for defendant that plaintiff's testimony, properly interpreted, shows that he did accept the carriage in question, knowing that it had a broken shaft. We are not to be understood as either deciding or conceding that if plaintiff had such knowledge, it would necessarily follow from this that he should have been nonsuited for contributory negligence. It would be necessary to consider, under all the circumstances (some of which we are passing without mention), whether the plaintiff was indisputably lacking in the care that a reasonably prudent man would have exercised, and if so, then whether his want of care beyond dispute contributed to the runaway.

It is further argued that plaintiff's coachman (who admittedly did know the shaft was broken before the horse was attached to the livery carriage) was guilty of negligence, and that such negligence is attributable to the plaintiff on the doctrine *"respondeat superior."* But, as already mentioned, the coachman observed that, although a piece was missing from the end of the shaft, the shaft still projected six inches beyond the tug, and besides, he seems to have been present when the stablemen assured Mr. Opdycke that the broken shaft did not interfere with the wagon's efficiency. Whether the acceptance of the wagon under these circumstances constituted negligence on the coachman's part is not so free from doubt as to be decided by the court as matter of law. Moreover, it is by no means certain that the plaintiff was chargeable with the consequences of the coachman's conduct in this regard. There is no clear evidence of express authority given at the time by Mr. Opdycke to the man with respect to the selection or acceptance of a wagon at the livery stable, nor is there anything to show that the performance of such a function was within the scope of his general employment. It would seem that such authority as the coachman possessed, if any, arose for that occasion only, and merely by implication from the circumstances and the conduct of the parties at the time. The question of the existence and extent of such au-

thority certainly could not be determined against the plaintiff without submission to a jury.

From all of which it results that the nonsuit cannot be sustained upon the ground of contributory negligence.

The other ground upon which the decision below was rested is that no negligence or breach of duty on the part of the defendant was shown with respect to the construction or maintenance of the bridge in question, either (a) because the bridge was not within the legal limits of the highway, or (b) because it was outside of the traveled way and not in its nature a nuisance.

It appears that the runaway horse, following the direct route towards plaintiff's home, proceeded along a public highway formerly known as the Easton turnpike, which at a point between Bound Brook and Somerville crosses a stream known as the Middle brook. In and along the same highway the defendant company maintains a street railway line. To the eastward and also to the westward of Middle brook the tracks run alongside the traveled part of the highway and are ballasted with cracked stone. The tracks are substantially of the same level with the adjacent surface. Upon approaching the brook the tracks diverge from the wagonway and are carried over the brook by a separate bridge. The wagon bridge is about twenty feet wide. Parallel to it, and separated from it by a few feet, is the bridge maintained by the defendant company. This has a width of about twelve feet, and is of approximately the same level as the wagon bridge. As already noted, it is not at all designed for use by horses or horse-drawn vehicles. On the contrary, its construction resembles that of a steam railway bridge; the rails rest upon cross-ties ten feet in length and spaced about nine inches apart (eighteen inches between centres); there are no flooring planks. It is readily inferable that a bridge so designed and constructed is not merely unsuited to ordinary travel, but highly dangerous to it, and that a hoofed animal attempting to cross upon it could hardly fail to be injured. There was no fence or railing to confine travel to the wagon bridge, and the whole situation was such that the jury might reasonably infer that

an uncontrolled animal going in the dark along the highway, especially if in a state of excitement, might as probably enter upon the trolley bridge as upon the wagon bridge.

The highway in question was laid out in the year 1807 as the "New Jersey Turnpike Road." See *Pamph. L.* 1806. *p.* 586. According to the evidence, its width, at the place in question, is four rods, or sixty-six feet. It appears that in the year 1870 the turnpike company made a deed or deeds purporting to convey the road (or at least this portion of it) to the inhabitants of the township or to the inhabitants of the county through which it extended. These deeds were introduced in evidence, apparently for the purpose of showing a surrender, by the turnpike company to the public, of the care of the road and the franchise of taking tolls upon it. The deeds have not been printed with the case as submitted to us; but for present purposes this is of no consequence. It is admitted that the road was a public highway; and, this being so, it makes no difference whether it was a toll road or a free road; in either case the right of a member of the general public as against one maintaining within its limits a nuisance or unauthorized structure would be the same. *Wright* v. *Carter,* 3 *Dutcher* 76, 81 (reversed on error, but upon another point; see 5 *Vroom* 207, 208) ; *State, Parker, Prosecutor,* v. *City of New Brunswick,* 3 *Id.* 548, 551; affirming, *S. C.,* 1 *Id.* 395, and citing with approval *Com.* v. *Wilkinson,* 16 *Pick.* 175. See, also, *Borough of Chambersburg* v. *Manko,* 10 *Vroom* 496.

According to the evidence, the railway bridge is well within the limits of the highway width of sixty-six feet. Admittedly it is maintained by the defendant company. It appears to have been built by defendant's predecessor in title, in order to accommodate a line of railroad constructed pursuant to an ordinance adopted by the municipal authorities giving consent for the construction and maintenance of a street railway "driven by electricity from overhead wires suspended on poles, and commonly called the overhead or trolley system, in, over and upon certain streets, roads, highways and public places," &c.

It will be convenient to consider—*first,* how the case would

stand if no consent had been given in behalf of the public for the construction and maintenance of the railway bridge at the place in question; and *secondly,* what is the scope and effect of the municipal consent that was given.

It is argued that although the bridge in question was located within the limits of the highway as laid out, yet because ordinary travel was carried over Middle brook by the wagon bridge, and because the space at the side of this bridge was a sort of ravine, approximately twelve feet in depth, and, from the steepness of its sides and the existence of the brook at the bottom, unavailable for passage by ordinary vehicles, therefore this space was not a part of the highway in fact, and it was lawful for the defendant company to place there a bridge designed for its own purposes exclusively, not only unsuited for use by horses and carriages, but dangerous when used by them.

To this argument we cannot give our assent. When a public highway is laid out of a certain width—as in this instance of the width of sixty-six feet—that entire space becomes devoted to public use for all purposes of a highway. True, the abutting owner ordinarily retains the ownership of the fee, and may use it for purposes not inconsistent with the public travel. So, also, it by no means follows that the turnpike company or the public authorities are required to grade and work every portion of the highway's width, or obliged to remove all obstructions or to furnish bridges and culverts extending to the entire width, in such manner that the whole may be suitable for purposes of ordinary travel. We are not here concerned with any such question, but solely with the extent of the public easement of passage. The width of the wagonway, or of the bridge, bears upon the question whether the highway is more or less adapted to the comfortable accommodation of the traffic upon it; but these conveniences do not limit the public rights of passage. It is a matter of common knowledge that where a highway crosses a stream and a bridge of lesser width is thrown across, people upon horseback and in vehicles may at times prefer the ford to the bridge; driven cattle may likewise prefer it; at all events, the whole road is open to the public as a way.

It is well settled that one who places an unauthorized obstruction within the limits of a highway as laid out is liable to an action at the suit of any person who is thereby specially damnified, and this although the obstruction or other nuisance may be without the limits of the traveled way.

In *Durant* v. *Palmer,* 5 *Dutcher* 544, 547, Mr. Justice Haines, speaking for this court, said: "The street, and every part of it, by force of the common law, is so far dedicated to the public that any act or obstruction that unnecessarily incommodes or impedes its lawful use by the public is a nuisance." See, also, *Temperance Hall Association* v. *Giles,* 4 *Vroom* 260; *Meyers* v. *Birch,* 30 *Id.* 238.

In *Tinker* v. *New York, Ontario and Western Railway Co.,* 157 *N. Y.* 312, where defendant, an abutting landowner, had placed two disused timbers, each ten feet long and twelve inches square, within the highway limits, not in the beaten track, but in a ditch from one to two feet in depth, they being placed at a distance of about twelve feet from the traveled part of the highway and about fifteen feet from the fence separating the highway from the defendant's land, and being left there without reasonable necessity in the transaction of its business, it was held there was a liability to damages sustained by the plaintiff through her horses having taken fright at these timbers. And see the recent case of *Sweet* v. *Perkins,* 196 *Id.* 482, 486.

In 15 *Am. & Eng. Encycl. L.* (*2d ed.*) 492, the rule is stated as follows: "The right of the public to use a highway extends to the whole breadth thereof, and not merely to the part which is worked or actually traveled; and, consequently, an obstruction upon the untraveled part is a proper subject of complaint by the public or persons specially injured."

This, in our judgment, is a correct statement of the law upon the subject. See, also, *Rex* v. *Wright,* 3 *Barn. & Ad.* 681 (23 *E. C. L.* 159); *Regina* v. *United Kingdom Electric Telegraph Co.,* 3 *Fost. & Fin.* 73; 8 *Jur.* (*N. S.*) 1153; *Dickey* v. *Maine Tel. Co.,* 46 *Me.* 483; *Commonwealth* v. *Wilkinson,* 16 *Pick.* 173; *Commonwealth* v. *King,* 13 *Metc.* 115,

118; *Commonwealth* v. *Boston and Lowell Railroad Corporation,* 12 *Cush.* 254, 258.

Upon the whole, we deem it entirely clear that, in the absence of authority derived from the law-making power, the bridge now in question would be a nuisance, and we therefore proceed to consider the scope and effect of the municipal consent that was given for its construction and maintenance.

We assume the municipality gave consent, so far as it had power to do so. We make this assumption in favor of defendant in error because the plaintiff in error has failed to submit to us the entire text of the ordinance, and does not specifically make the point that the bridge and its location and style of construction were not within the wording or the fair intendment of the ordinance.

Counsel have not referred us to the specific act of the legislature from which the municipality derived the power to give this consent. Presumably it was the so-called "Traction Companies act" of March 14th, 1893 (*Pamph. L., p.* 302; *Gen. Stat., p.* 3235), which authorizes the formation of corporations for constructing, maintaining and operating such railways, "and all necessary turnouts, sidings and bridges on, along, through or over any street, road, lane, alley, stream or highway," with the consent of the board of aldermen, common council or body having control of streets or highways, or other governing body of the municipality within whose limits the railway is proposed to be constructed or operated. We are not aware that any more ample legislative authority is to be found elsewhere.

We may for present purposes concede that this legislation is broad enough to contemplate the construction by a traction company of a separate bridge in the highway for carrying its tracks, when in the judgment of the municipal authorities the ordinary highway bridge is not adequate to accommodate such tracks, and the cars that are to be operated thereon, in addition to the other traffic of the highway.

But, in our opinion, the statute does not permit the construction and maintenance by the traction company in the highway of a bridge that in design and construction is dan-

gerous to ordinary travel and calculated to entrap and kill horses and other animals that may attempt to pass over it.

For the object of the act of 1893, as expressed in its title and manifest in its enacting clauses, is to provide for the construction and operation of *"street railways or railroads operated as street railways,"* and the regulation of the same. Our decisions render it plain that what is meant by this is a railway so constructed, maintained and operated as not materially to interfere with the use of the highway by the general public for other and ordinary highway purposes. It was long ago held that a steam railroad was inconsistent with the user of a highway for ordinary purposes. *Starr* v. *Camden and Atlantic Railroad Co.*, 4 *Zab.* 592. But street railways have been otherwise regarded. Before the introduction of electric traction it was held by Chancellor Green in *Hinchman* v. *Paterson Horse Railroad Co.*, 2 *C. E. Gr.* 75, 80, that the building and operation of a horse railroad in the streets of a city under legislative sanction was a legitimate use of the highway and an exercise of the public right of travel, and not a taking of private property for public use within the provision of the constitution. This was upon the ground that the tracks of the street railway did not practically increase the burden upon the landowner, the learned Chancellor saying that such tracks "are ordinarily, as in this case, required to be laid level with the surface of the street in conformity with existing grades. No excavations or embankments to affect the land are authorized or permitted. The use of the road is nearly identical with that of the ordinary highway." Since the introduction of electricity as a means of propulsion the same rules have been applied to electric street railways that had formerly been applied to horse railroads. *Halsey* v. *Rapid Transit Street Railway Co.*, 2 *Dick. Ch. Rep.* 380; *Van Horne* v. *Newark Passenger Railway Co.*, 3 *Id.* 332; *West Jersey Railroad Co.* v. *Camden, &c., Railroad Co.*, 7 *Id.* 31; *Roebling* v. *Trenton Passenger Railway Co.*, 29 *Vroom* 666, 671, 673; *Consolidated Traction Co.* v. *South Orange, &c., Traction Co.*, 11 *Dick. Ch. Rep.* 569, 581; *Budd* v. *Camden Horse Railroad Co.*, 16 *Id.* 543, 553; *Newark* v. *State Board of Taxation*, 37

*Vroom* 466, 472; 38 *Id.* 246; *Montclair Military Academy* v. *North Jersey Street Railway Co.,* 41 *Id.* 229, 231; *Newark Passenger Railway Co.* v. *Block,* 26 *Id.* 605, 610.

It would be quite inconsistent with the grounds upon which these cases were decided to hold that the consent given by a municipality, pursuant to the act referred to, for the construction, maintenance and operation of a trolley railroad in, upon and along the streets, furnishes a warrant for the construction and maintenance within the limits of the highway of any bridge or other structure for the accommodation of the tracks that is so constructed as to be not only impassable but dangerous for ordinary travel, and from its design calculated to entrap and kill horses and other animals that may attempt to pass over it.

The grant to the street railway company is necessarily subject to the condition (implied, if not expressed), that its tracks shall be so laid, constructed and maintained as not to materially interfere with any other lawful use of the highway.

To sum up this matter: The evidence before us justified, if it did not require, a finding that the trolley railway bridge in question (being within a public highway) was so constructed and maintained with respect to its design and location as to render dangerous the use of the highway for other lawful purposes. This being found as matter of fact, such a structure would be a nuisance at the common law, and, unless authorized by legislation, would render the defendant responsible to any member of the public specially damnified, as the plaintiff was, by reason of the nuisance. From what we have said it also appears that no legislative authority has been conferred upon the defendant company to maintain its tracks and bridge in the highway in such manner as to endanger ordinary travel. Consequently, on familiar principles, the company may be held responsible for the damages accruing by reason of the improper and dangerous character of its bridge. 2 *Thomp. Negl.,* §§ 1353, 1355; *Fielders* v. *North Jersey Street Railway Co.,* 39 *Vroom* 343, 346; *Alcott* v. *Public Service Corporation, ante p.* 482.

And so we conclude that the nonsuit cannot be sustained upon either of the grounds relied upon by the trial judge.

Finally, it is argued that the defendant is not liable to the plaintiff in the present case, because the horse was running beyond control. We cannot, however, agree that this circumstance debars the plaintiff of his action, unless the runaway was caused by the negligence of the plaintiff or his agent, and this, as we have already shown, could not in the state of the evidence be properly decided against the plaintiff without submission to the jury.

So long as horses require to be restrained by bit and bridle, it must inevitably at times occur—with what frequency or infrequency is of no present importance—that horses get beyond the control of the person in charge and run at will through the streets and highways. An occasional runaway horse must necessarily be anticipated. The owner does not lose his property rights because the horse runs away. On the contrary, he is entitled to the use of the highway as a means to enable the horse to reach its home. And so the fact that the animal was at the time beyond the control of the owner cannot be availed of as a defence by one who has placed and maintained an unauthorized or improper structure in the highway.

In *Baldwin* v. *Greenwoods Turnpike Co.*, 40 *Conn.* 238, 244, the plaintiff's horse, while being driven upon a road other than that of the defendant company, became frightened by the breaking of the carriage, due to a defect for which the plaintiff was not at fault; the horse ran away, threw out the driver, and afterwards left the highway and passed over private property to and upon the turnpike road of the defendant, where he fell over the side of a bridge by reason of a defect in the railing, attributable to the negligence of the turnpike company. The company was held liable, the court declaring the proper rule to be this: "If the plaintiff is in the exercise of ordinary care and prudence, and the injury is attributable to the negligence of the defendants, combined with some accidental cause to which the plaintiff has not negligently contributed, the defendants are liable. Nor will the fact that the

horse of the plaintiff was uncontrolled for some distance before the injury change or in any way affect the liability of the defendants."

To the same effect are *Ring* v. *City of Cohoes,* 77 *N. Y.* 83; *Yoders* v. *Township of Amwell,* 172 *Pa.* 477.

The judgment under review should be reversed, and a *venire de novo* awarded.

*For affirmance*—None.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, VOORHEES, MINTURN, BOGERT, VREDENBURGH, VROOM, DILL, CONGDON, JJ. 14.