Price v. Inhabitants of Plainfield.

---

J. WILBUR PRICE, PLAINTIFF IN ERROR, v. THE INHABITANTS OF THE CITY OF PLAINFIELD, DEFENDANTS IN ERROR.

1. The local municipal government within the limits of which dedicated lands lie, by virtue of their representing the public, may maintain actions to vindicate the public's right of possession.
2. Declarations of former owners of lands made after parting with title in them, are inadmissible.
3. The word "park" written upon a block on a map of city property indicates a public use, and conveyances made by the owners of the plotted land, by reference to such map, operates conclusively as a dedication of the block.
4. No right can be obtained against the public in dedicated lands, by adverse possession.

Argued at June Term, 1878.

For the plaintiff in error, *W. J. Magie* and *B. Williamson.*

For the defendants in error, *Wm. B. Maxon.*

The opinion of the court was delivered by

REED, J. This is an action of ejectment brought by the city of Plainfield against Price, to test the right of the defendant to the possession of a plot of ground which the plaintiffs allege was dedicated to the use of the public. The plot contains about three acres, and is represented upon a map marked as a " Map of building lots in Plainfield, N. J.," by a space, on the face of which is the word " Park." This space is also marked block " Q." This map delineates a tract of ground covering about sixty-one acres. The map was placed in the clerk's office of Essex county, previous to the formation of Union county, wherein the land now lies. It is marked " Filed April 20, '53. Weeks, cl'k." It was placed on file by T. B. Steelman, who was the legal owner of the fee of the tract. He held it in trust for himself and three others : Clark Rogers, Nathan Rogers, and Nicholas Rogers. By an agreement entered into between Steelman and the three Rogers, on April 6th, 1853, it was covenanted that, after the filing of this map, Steelman should convey the lots thereon, some to the Rogers, and others to purchasers, and account to the Rogers for the proceeds of such sales. Both before and after the filing of this map, lots were so conveyed by reference thereto. In August, 1856, block " Q," the plot now in controversy, was conveyed to one Dow, and afterwards came to the defendant, Price. The city of Plainfield insisted that, by the making and filing the said map, and conveying lots by reference thereto, in 1853 and 1854, the owners of said tract " Q," upon which the word " Park" is written, dedicated it to the public. Upon the trial, a motion to non-suit was made at the close of the plaintiff's case. An exception was sealed to the rule refusing to order it. Exceptions were also

sealed to the ruling of the court in admitting certain declarations of the grantors of the lots after they had sold block "Q." The defendants, against whom there was a verdict and judgment, now urge that there is error in the proceedings upon four points—

*First.* That, if there was a dedication of block "Q," there is no right in the city of Plainfield to bring this action.

*Second.* That the admission of evidence of the declarations of Clark Rogers and T. B. Steelman, made after they had parted with their title in the plot of ground in controversy, was erroneous.

*Third.* That the construction given in the charge at the trial, to the meaning of the word "park" written upon block "Q," was erroneous.

*Fourth.* That the refusal to charge that the defendant could gain a right against the city by adverse possession, was erroneous.

First, then, I think there was no error in the ruling of the judge, that, if there had been a dedication to the public, the right to protect the public's right of possession was in the city of Plainfield.

The *locus in quo* was within the limits of that city. The city itself was incorporated in 1869. *Pamph. L., p.* 1241. The charter conferred the powers usually exercised by such a municipality. It created a council and the usual number and class of city officers. It conferred upon council the authority to legislate for the regulation of streets and the other objects of internal government. It did not specifically mention as one of those objects, public parks. From this fact it is contended that the city had no right to regulate this place, although dedicated to the public, and therefore no right to the possession of it, and so the city has no *status* in court as a plaintiff in a suit to vest the right of possession.

The ground taken by the defendant is, that there is no authority vested in a city to bring an action of ejectment to try the possessory title to dedicated lands, unless the city is charged by law with some right or duty respecting such

lands, which duty cannot be discharged without the city's exclusive possession.

If by this is meant that there must be a specific grant of power for such purpose, I think the position has little support in authority, and is opposed to the doctrine announced by our own courts. The theory upon which the right exists in the city, is by virtue of its representing the public in which is the right of possession. *Dovaston* v. *Payne*, 2 *Smith's Lead. Cas.* *222.

This was the principle upon which the right to bring the action by the city of Hoboken was alone placed, in the case of *Trustees of M. E. Church* v. *Hoboken*, 4 *Vroom* 13, 19, and the doctrine was re-stated with approval in the case of *Hoboken Land Improvement Co.* v. *Mayor of Hoboken*, 7 *Vroom* 540, decided in this court.

The case of *Manko* v. *Borough of Chambersburg*, 10 *Vroom* 496, is cited as presenting a contrary rule; but I do not so understand it. The doctrine of that case is, that where there is a different body indicated by the legislature as the party which is to have the right and perform the duties which would otherwise be exercised by the local government, then there is no necessity for the possession of the municipality, and, consequently, no right in the borough to assert the public's right to such possession. It was held, in that case, that all the duties which might otherwise have rested upon the local government in which the highway in question was located, was, by the act incorporating the Crosswicks Turnpike Company, imposed upon that corporation. There is nothing in this case to bring it within the rule in that case. The city of Plainfield, as the local government, had, as such, the right to the possession of the plot "Q." I do not think there is any ground for the contention that the township of Plainfield, and not the city of Plainfield, is the corporate entity which represents the public in this matter. That the city of Plainfield is the local government having control of all matters concerning the use of property of this character by the public, is too obvious for further remark.

The second point relied upon by the defendant is, that the court, at the trial, admitted improper testimony. This is the evidence that Clark Rogers and T. B. Steelman, who parted with all their interest in the land now in question, in 1856, subsequently made certain declarations which affected the defendant's title.

One declaration of Rogers was made in 1864, and was to the effect that the property could not be diverted from its present use, and another in 1861 or 1862, that it was to be retained as a public park. Steelman's declarations were made in 1860 and 1864, and were to the effect that the piece of property marked upon the map was reserved for a park, and not to be built upon.

These declarations qualified a title in which the witnesses, at the time, had no interest, and were, as declarations, clearly inadmissible. They were so recognized at the trial, but were admitted for another purpose, as appears from the charge of the trial justice.

The question of its competency for any purpose, is unimportant, for its admission did not prejudice the cause. This results from the force which should be given to the evidence of the making and filing the map of the property in question, with a block upon it marked as "Park," followed by conveyances of lots in reference thereto. The consideration of the legal effect resulting from these acts, disposes of the third point of defendant's contention, that the refusal to charge that the word " park " might mean either a private enclosure or a public resort, was erroneous.

In support of the view that the word " park," as marked upon this map, was of equivocal signification, our attention was called to the various definitions of the term as contained in works of legal and literary authority.

One of its significations is undoubtedly " an enclosure over one's grounds." It is doubtless true that this is one of the definitions of the term "park." In the English law this was its only meaning. The term "park" meant an enclosure upon a man's own land, in which beasts of park were kept, such as

the buck and the roe.   He could do this only by permission
of the crown.   The Norman kings arrogated the exclusive
right to hunt throughout the realm.   The right to hunt or to
enclose beasts was therefore a franchise resting entirely upon
grant, and confined to the land of the subject.   The word
" park," when used by a writer upon this class of incorporeal
rights, would, therefore, have not an ambiguous, but a well
settled meaning.

Its meaning would be settled by the relation of the word
to the circumstances surrounding its use.

The defendants' counsel admits that circumstances may
make its meaning uncertain.   I think the circumstances
around its use, in this case, are such as to settle its meaning
beyond question ; and its meaning is, a place for the resort
of the public for recreation, air, and light.   Had the word
" square " been upon the map, I suppose there would hardly
have been a contention but that it worked together with the
other acts—a dedication. If the words " public park " had been
upon it, no question would have arisen.   But a park in a
city means to the sense of every person a place open to every
one.   It carries no idea of restriction to any part of the public
or to any specific number of persons.   Restrictions as to time
of entrance or behavior of those entering are conceivable, but
the idea that any class of the community is to be excluded,
would not be entertained primarily by any person in connec-
tion with the idea of a park within the limits of a city.   That
it was to be a place of public resort, would be the impression
which any person would receive, by looking at the map in
this case, delineating a tract of sixty acres, with streets, and a
square or block, upon which is marked " Park."   The grantee
in a deed made by reference to it, has a right to so under-
stand it.   Neither the grantors nor any person claiming under
them, can come in, and, against any such grantee, or against
the public, set up an intent differing from that which the
word adopted naturally imports.   There is no such uncer-
tainty of meaning as will let in parol testimony to vary or
modify it.   If the grantors had a different intention, that
should have appeared from the papers themselves.   The pop-

ular and natural meaning should have been so modified, in accordance with such intention. I think that all parol testimony of such intention was incompetent to vary the purport of the mapping, filing, and conveyances, and that a dedication was conclusively effected by such acts.

It is finally urged that the court erred in charging that the public lost no right by the continued and exclusive possession of the defendant. It is insisted that, while the maxim *"nullum tempus occurrit regi"* is applicable to the state itself, it cannot be applied to subordinate corporations, although acting as public agents.

Notwithstanding the contrariety of opinion which seems to exist elsewhere, the rule upon this subject, in this state, is settled by too many and too forcible decisions to be easily shaken. The rule is the opposite of the one for which the defendants contend. A city never loses its right to protect the right of the public in property in which there is a public easement, by reason of an adverse possession. Unauthorized acts of exclusive possession by any party upon a street or public square, is a nuisance which no time will legalize without statutory aid.

The idea that a street could be enclosed so as to bar the rights of the public represented by a city, was repudiated by this court in the case of *Mayor of Jersey City* v. *Morris Canal and Banking Co.*, 1 *Beas.* 547, 561. The grounds of the doctrine were discussed at length, and re-asserted in *Cross* v. *Mayor of Morristown*, 3 *C. E. Green* 305, 311. And it has since been considered the settled doctrine in this state. *Tainter* v. *Morristown*, 4 *Vroom* 57; *Same* v. *Same*, 4 *C. E. Green* 46; *State, Bodine, pros.*, v. *Common Council of Trenton*, 7 *Vroom* 198, 201.

Judgment should be affirmed.

*For affirmance*—The Chancellor, Chief Justice, Depue, Knapp, Reed, Scudder, Woodhull, Clement, Dodd, Green, Lilly, Wales. 12.

*For reversal*—None.