592 A.2d 199

JAMES J. DEVINS AND MARY J. DEVINS, HIS WIFE, PLAINTIFFS-APPELLANTS, v. BOROUGH OF BOGOTA, DEFENDANT-RESPONDENT.

Argued October 22, 1990—Decided July 10, 1991.

*Allen M. Bell* argued the cause for appellants (*Jacobs, Bell & Baumol,* attorneys; *Doreen E. McManimon,* on the brief).

*Joseph G. Monaghan* argued the cause for respondent (*De-Marrais & Monaghan,* attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

The primary issue on this appeal is whether adverse possession should apply to municipally-owned property not dedicated to or used for a public purpose. Ruling that adverse possession should not so apply, the Appellate Division affirmed the Chan-

cery Division's grant of summary judgment for the municipality, Borough of Bogota ("the Borough" or "Bogota"). 237 *N.J.Super.* 596, 568 *A.*2d 903 (1989). We granted the petition for certification of plaintiffs-appellants, James J. Devins and Mary J. Devins, his wife, 121 *N.J.* 603, 583 *A.*2d 307 (1990), and now reverse and remand to the Chancery Division. We hold that municipally-owned property neither dedicated to nor used for a public purpose is subject to acquisition by adverse possession.

I

Because this matter reaches us on plaintiffs' appeal from a summary judgment for defendant, we accept plaintiffs' version of the facts and give plaintiffs the benefit of all favorable inferences. *R.* 4:46–2; *see Pierce v. Ortho Pharmaceutical,* 84 *N.J.* 58, 61, 417 *A.*2d 505 (1980); *Judson v. Peoples Bank & Trust,* 17 *N.J.* 67, 73–77, 110 *A.*2d 24 (1954).

The property is a 25 × 100 foot lot located on Fairview Avenue and identified as Lot 10, Block 98 on the municipal tax map. In 1962, Bogota acquired title to the property through an *in rem* foreclosure. At that time, the lot was vacant. Since then, Bogota has not improved or used the property, nor has it dedicated the property to public use.

In 1965, plaintiffs purchased from James and Jeanette Geraghty an adjacent single-family residence at 132 Fairview Avenue, identified as Block 98, Lots 11 and 11A on the municipal tax map ("the house lot"). At that time, the Geraghtys, who in 1958 had received a quitclaim deed to Lot 10 from their grantors, also executed a quitclaim deed for that lot. Sometime before 1958, a chain link fence had been erected around Lot 10. That fence matches a fence around the house lot, creating the appearance that the lots are commonly owned. A barbecue pit, which had been constructed before plaintiffs acquired the house lot, remains on Lot 10.

Since 1965, plaintiffs have used Lot 10 for parking, cookouts, lounging, and other recreational purposes. Plaintiffs installed a basketball backboard on the lot in the mid–1970s and erected a shed around 1980. Additionally, they have mowed the grass and otherwise maintained the lot. At some point, a portion of Lot 10 was paved to provide parking for the house lot. Before the institution of suit, Bogota had not challenged plaintiffs' use of the property.

For their part, plaintiffs have never paid taxes on Lot 10. In 1985, however, their attorney sent a letter to the Mayor and Council of Bogota requesting that the Borough concede that plaintiffs had acquired title to Lot 10 by twenty years' adverse possession. The Borough promptly denied plaintiffs' claim, asserting that adverse possession cannot run against a municipality.

Plaintiffs then filed this action seeking a declaration that they had acquired title by twenty years' adverse possession. Although the Chancery Division believed that plaintiffs had established facts that could constitute adverse possession, it ruled that "adverse possession will not run against a municipality." Consequently, the court granted summary judgment for the municipality.

The Appellate Division affirmed. Its opinion begins by noting the general rule "that title to property held by a municipal corporation which is dedicated to public use cannot be acquired by adverse possession." 237 *N.J.Super.* at 600, 568 *A.*2d 903. The court declined to draw the distinction between public and non-public uses, and rejected plaintiffs' argument that by failing to use the property for a public purpose, Bogota had made "it vulnerable to alienation by adverse possession." *Id.* at 601, 568 *A.*2d 903. Instead, the court concluded that plaintiffs had not acquired title to the property "regardless of whether the land is deemed to be dedicated to public use or not." *Id.* at 603, 568 *A.*2d 903.

## II

Adverse possession is a method of acquiring title by possessing property in a specified manner for a statutory period. The expiration of that period bars the owner's right to bring an ejectment action and transfers title from the owner to the possessor. Title passes to the adverse possessor when the owner fails to commence an action for recovery of the property within the specified statutory period. *Patton v. North Jersey Dist. Water Supply Comm'n,* 93 *N.J.* 180, 186, 459 *A.*2d 1177 (1983). In effect, the acquisition of title by adverse possession is based on the expiration of a statute of limitation. *O'Keeffe v. Snyder,* 83 *N.J.* 478, 494, 416 *A.*2d 862 (1980).

The statutory requirements vary according to the period of possession, the nature of the land possessed, and whether the adverse claim is under color of title. Two statutes, *N.J.S.A.* 2A:14–6 and *N.J.S.A.* 2A:14–7, require a twenty-year period; one, *N.J.S.A.* 2A:14–31, requires a thirty-year period for real estate held under a claim of title; and another, *N.J.S.A.* 2A:14–30, requires either thirty or sixty years, depending on whether or not the property is "woodlands or uncultivated." Yet another statute, *N.J.S.A.* 2A:14–8, imposes a twenty-year period of limitations on the State of New Jersey for actions concerning real property. Common to all the statutes is the requirement that the property must be adversely possessed for a considerable period of time. Plaintiffs have not identified the specific statute or statutes on which they base their claim. Instead, they have merely asserted that they have adversely possessed Lot 10 for more than twenty years.

Historically, courts have been more exacting when reviewing claims of adverse possession of governmentally-owned property. So stringent are the requirements that neither our research nor that of counsel has uncovered a New Jersey case allowing a claim of adverse possession of governmental property. In the absence of any authority, the Appellate Division denied plain-

tiffs' claim of title even though the property had not been dedicated to public use.

The rule restricting acquisition of governmental property, however, is narrower than the holding of the Appellate Division. As we stated in *Patton v. North Jersey District Water Supply Commission, supra,* 93 *N.J.* at 190, 459 *A.*2d 1177, "there can be no adverse possession against subdivisions of the State, at least with respect to property dedicated to public use." We now decide the question left undecided in *Patton:* whether municipal property not dedicated to or used for a public purpose is subject to adverse possession.

The restriction on the application of adverse possession to public property is rooted in the ancient doctrine that time does not run against the king, sometimes expressed in the Latin phrase *nullum tempus occurrit regi.* The phrase, which is often shortened to *"nullum tempus,"* means "[t]ime does not run against the king." *Black's Law Dictionary* 1068 (6th ed. 1990). Although none of the New Jersey statutes of limitation expressly excepts governmental entities, courts have long ruled, in reliance on the principle of *nullum tempus,* that the statutes do not run against property owned by either the State, *Quinlan v. Borough of Fair Haven,* 102 *N.J.L.* 443, 446–47, 131 *A.* 870 (E. & A.1926), or by a municipality, *Osterweil v. City of Newark,* 116 *N.J.L.* 227, 182 *A.* 917 (E. & A.1935); *City of Long Branch v. Toovey,* 104 *N.J.L.* 335, 337–38, 140 *A.* 415 (E. & A.1927); *Price v. Inhabitants of Plainfield,* 40 *N.J.L.* 608 (E. & A.1878); *Mayor of Jersey City v. Morris Canal & Banking Co.,* 12 *N.J.Eq.* 547 (E. & A.1859); *Dvorin v. City of Bayonne,* 111 *N.J.Eq.* 52, 54–55, 161 *A.* 654 (Ch.1932); *Tainter v. Mayor of Morristown,* 19 *N.J.Eq.* 46 (Ch.1868); *Cross v. Mayor of Morristown,* 18 *N.J.Eq.* 305, 313 (Ch.1867). These decisions, however, have all involved land dedicated to or used for a public purpose.

Our analysis leads us to conclude that the *nullum tempus* exception to adverse possession should not be extended to

include land held by a municipality for non-governmental purposes. The original rationale supporting *nullum tempus* was that the king was too busy protecting the interests of his people to keep track of his lands and to bring suits to protect them in a timely fashion. *Cornelius & Empson v. Giberson*, 25 *N.J.L.* 1, 28 (Sup.Ct.1855); *see* Note, *Developments in the Law; Statutes of Limitations*, 63 *Harv.L.Rev.* 1177, 1251 (1950) (explaining origin and developments of the exception for sovereigns). A second reason was that the king established his own rules for litigation, *see* Note, *State's Immunity to the Statute of Limitations*, 38 *Ill.L.Rev.* 418, 419 (1944) (describing and criticizing *nullum tempus*).

In New Jersey, *nullum tempus* developed primarily in the context of claims of adverse possession of public lands. As explained by the courts, the reasons for the rule include: first, the public should not suffer from the negligence of its agents, *see State v. Owen*, 23 *N.J.Misc.* 123, 127–28, 41 *A.*2d 809 (Sup.Ct.1945); *Trustees, Pub. Schools v. The Ott & Brewer Co.*, 135 *N.J.Eq.* 174, 177, 37 *A.*2d 832 (Ch.1944); second, absent the express inclusion of the State, a statute of limitations should not be read to affect adversely the State's rights, *see Osterweil*, *supra*, 116 *N.J.L.* at 233, 182 *A.* 917; *Trustees, Pub. Schools v. Inhabitants of Trenton*, 30 *N.J.Eq.* 667, 681–86 (E. & A.1879); third, the State holds public property in trust for the people, so only the Legislature can divest the State of title, *see Hoboken Land & Improvement Co. v. Mayor of Hoboken*, 36 *N.J.L.* 540, 549 (E. & A.1873); *Owen*, *supra*, 23 *N.J.Misc.* at 128–30, 41 *A.*2d 809; and finally, possession of public lands by a third party constitutes a public nuisance that no period of acquiescence will justify, *see Price*, *supra*, 40 *N.J.L.* at 614; *Cross*, *supra*, 18 *N.J.Eq.* at 311–13.

Those reasons are subject to countervailing considerations. First, statutes of limitation allow repose and avoid adjudications based on stale evidence. *See* Criminal Law Revision Commission, *Commentary to N.J.S. 2C:1–6* (1971), *reprinted in* Cannel, Criminal Code Annotated, *N.J.S.* 2C:1–6, Comment 3 (1991);

Note, *supra*, 63 *Harv.L.Rev.* at 1185–86. Second, adverse possession promotes certainty of title, *see* Ballantine, *Title by Adverse Possession*, 32 *Harv.L.Rev.* 135, 135 (1918), and protects the possessor's reasonable expectations, *see* Note, *supra*, 63 *Harv.L.Rev.* at 1185. Third, allowing adverse possession promotes active and efficient use of land, *see* R. Posner, *Economic Analysis of Law* 70–71 (3rd ed.1986); Netter, Hersch & Manson, *An Economic Analysis of Adverse Possession Statutes*, 6 *Int'l Rev. of L. & Econ.* 217, 219 (1986), and "tends to serve the public interest by stimulating the expeditious assertion of public claims," *Eureka Printing Co. v. Department of Labor & Indus.*, 21 *N.J.* 383, 388, 122 *A.*2d 345 (1956). Consistent with this last proposition, plaintiffs argue that permitting adverse possession of municipal property would encourage municipal efficiency and the return of property to the tax rolls.

Recent trends in contract and tort law have eroded the notion that government should be treated as fundamentally different from private parties. In both torts, *see Willis v. Department of Conservation & Economic Dev.*, 55 *N.J.* 534, 264 *A.*2d 34 (1970) (abolishing sovereign immunity in tort); *N.J.S.A.* 59:1–1 to 12–3, and contracts, *see P.T. & L. Constr. Co. v. Commissioner, Dep't of Transp.*, 55 *N.J.* 341, 262 *A.*2d 195 (1970) (abolishing sovereign immunity in contract); *N.J.S.A.* 59:13–1 to 13–10, first the courts and then the Legislature have reconsidered sovereign immunity, with the result that the State may be liable in tort or contract.

In other states, legislatures have exposed the State to adverse possession claims in limited circumstances. The statutes in some states simply permit adverse possession of "any real property" held by the State. *N.C.Gen.Stat.* § 1–35 (1983); *N.D.Cent.Code* § 28–01–01 (1960); *Utah Code Ann.* § 78–12–2 (1953). Similarly, a Wisconsin statute provides that real property of the State or its subdivisions "may be obtained by adverse possession." *Wis.Stat.* § 893.29 (1983). Yet another State provides that the statutes of limitation apply to actions by the

State the "same as to actions by private persons." *Ky.Rev.
Stat.Ann.* § 413.150 (Baldwin 1972).

Other States qualify the power to obtain public real estate
through adverse possession. Massachusetts and Michigan both
permit adverse possession of State land but protect certain
types of land. Massachusetts permits no adverse possession of
State land "held for conservation, open space, parks, recreation,
water protection, wildlife protection, or other public purpose."
*Mass.Gen.L. ch.* 260, § 31 (1984). Michigan imposes no time
bar for actions by municipal corporations to recover "any public
highway, street, alley, or any other public ground." *Mich.
Comp.Laws* § 600.5821 (1987). In sum, state legislatures have
struck different balances when addressing the issue of adverse
possession of publicly-owned real estate. The point for our
purposes, however, is that those States have recognized that
their legislatures are specially suited to strike that balance.

Some commentators have called for the rejection of *nullum
tempus* in adverse possession actions. *See* Note, *supra,* 63
*Harv.L.Rev.* at 1252–53; Note, *supra,* 38 *Ill.L.Rev.* at 421.
Similarly, a congressional commission that studied adverse pos-
session of federal lands has recommended that *nullum tempus*
should be abolished and that all such lands be made subject to
adverse possession. The commission concluded that the federal
government has adequate resources to protect public land. *See*
Public Land Law Review Commission, Recommendation 113,
*One Third of the Nation's Land: A Report to the President
and to the Congress* 260–62 (1970).

Ultimately, the issue is one of public policy. We believe the
better rule concerning municipally-owned real property not
dedicated to or used for a public purpose is to treat it like
property owned by private owners. Underlying our belief is
the perception that we are not imposing an undue burden on
municipalities by expecting them to discover within the relevant
period of limitations what property they own and who possesses
it. That expectation will encourage municipalities to make

efficient use of their property and return it to the tax rolls. Conversely, we are reluctant to adopt a policy that would encourage municipalities not to use, dedicate, or even identify their property.

We conclude that for municipally-owned real estate not dedicated to or used for a public purpose, *nullum tempus* is an anachronism. Our decision today is consistent with decisions from Connecticut and Maryland, which hold that municipal land not used for a public purpose is subject to adverse possession. In *Goldman v. Quadrato*, 142 *Conn.* 398, 114 *A.*2d 687 (1955), the plaintiff claimed title by adverse possession to an adjacent lot owned by the City of Waterbury, which had acquired title through a tax-foreclosure proceeding. Noting that the city lot "was neither used for nor dedicated to any public purpose," 142 *Conn.* at 403, 114 *A.*2d at 690, the Connecticut Supreme Court held that the land was subject to adverse possession. More recently, the Maryland Court of Appeals relied on both a period of non-use and the absence of any planned future use to conclude that municipally-owned land was subject to acquisition by adverse possession. *See Siejack v. City of Baltimore*, 270 *Md.* 640, 313 *A.*2d 843 (1974). In *Siejack*, the plaintiff had operated for many years a dump on land owned by the City of Baltimore. The City had acquired the property when it purchased a water company servicing Baltimore, but had never used the land for any purpose. Because the City had never "devoted [the land] to public use and * * * it is unlikely it ever intends to do so," *id.* at 645, 313 *A.*2d at 846, the court concluded that the plaintiff could maintain an action seeking title by adverse possession.

## III

In this case, the lower courts understandably concentrated on municipal immunity from adverse possession. Notwithstanding some conclusory comments that possession by plaintiffs and their predecessors was open, notorious, and continu-

ous, the trial court did not focus on the nature of that possession.

We are concerned that plaintiffs and their predecessors sought to comply more with the letter than with the spirit of the adverse possession statutes. During the statutory period, they never formally notified the municipality of their claim. Nor did they pay property taxes on the lot, the one act that more than any other would have alerted the Borough to that claim. We are left with a feeling of unease whether their acts of possession were "of such a character as is calculated to inform the true owner," *Foulke v. Bond*, 41 *N.J.L.* 527, 545 (E. & A.1879), of their hostile possession. On remand, the trial court should consider not only whether their possession was of such a character, but also whether it was accompanied by " 'such circumstances of notoriety that the owner [would] be aware of the fact and thus alerted to resist the acquisition of the right by claimant,' " *Baker v. Normanoch Ass'n*, 25 *N.J.* 407, 420, 136 *A.*2d 645 (1957) (quoting *Predham v. Holfester*, 32 *N.J.Super.* 419, 424, 108 *A.*2d 458 (App.Div.1954)), and whether it gave " 'unmistakable notice' " to the Borough, *Mannillo v. Gorski*, 54 *N.J.* 378, 388, 255 *A.*2d 258 (1969) (quoting Tiffany, *Real Property* 291 (Supp.1969)). If the court should find that plaintiffs have satisfied the requirements for adverse possession, it should also consider whether, as a condition of relief, plaintiffs are obligated to pay the municipality back taxes on Lot 10. The parties have not raised that issue, and we do not address it.

■ The remaining question is whether our decision should be applied retroactively. We believe that the decision should be so applied to plaintiffs. The reason, as former Chief Justice Weintraub explained, is "that case law is not likely to keep up with the needs of society if the litigant who successfully champions a cause is left with only that distinction." *Willis, supra*, 55 *N.J.* at 541, 264 *A.*2d 34. Except for plaintiffs, however, we believe that we should give our decision prospec-

tive effect. Otherwise, we might create untold problems for municipalities in the ownership of parks, rights-of-way for streets, and other real property. Furthermore, the exception is so intertwined with the underlying statutes of limitation that we cannot extricate *nullum tempus* without damaging the roots of adverse possession. Given the legislative origins of statutes of limitation, including those underlying the doctrine of adverse possession, we anticipate that the Legislature might want to review those statutes in light of today's decision. In inviting the Legislature's attention, we note that other states have looked to their legislatures for the abolition of *nullum tempus*. *See, e.g., Ky.Rev.Stat.Ann.* § 413.150 (Baldwin 1972); *N.C.Gen.Stat.* § 1–35 (1983); *N.D.Cent.Code* § 28–01–01 (1960); *Utah Code Ann.* § 78–12–2 (1953); *Wis.Stat.* § 893.29 (1983). *See generally* Basye, *Clearing Land Titles* 181–82 § 53, nn. 8 & 9 (1970) (listing statutes that subject governmental property to adverse possession). We therefore commend the matter to the Legislature. Given the length of the various periods of limitation, the Legislature should have ample time to take whatever action it deems appropriate.

The judgment of the Appellate Division is reversed, and the matter is remanded to the Chancery Division.

*For reversal and remandment*—Chief Justice WILENTZ and Justices POLLOCK, CLIFFORD, HANDLER, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.