639 A.2d 1112

JOSEPH P. SLOWINSKI AND STACEY C. SLOWINSKI, HUSBAND
AND WIFE, PLAINTIFFS–APPELLANTS, v. THE COUNTY OF
MONMOUTH, A MUNICIPAL SUBDIVISION OF THE STATE
OF NEW JERSEY, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued December 15, 1993—Decided January 24, 1994—Reconsideration
Granted February 17, 1994 [1]—Reargued March 2, 1994—Decided
April 15, 1994.

---

[1] We granted plaintiffs' motion for reconsideration in which their counsel
pointed out a mistake in our quoting of a portion of the Tinton Falls Turnpike
Act and what constituted at least a lack of clarity in our description of.where the
"actual roads went" in colonial times. This opinion has been issued to replace
our opinion of January 24, 1994, which we have directed the clerk of the court to
withdraw.

Before Judges SHEBELL, LONG and LANDAU.

*Gertrude E. Slowinski,* argued the cause for appellants (*Mrs. Slowinski* on the brief).

*William J. O'Hagan, Jr.,* argued the cause for respondent (*Stout & O'Hagan,* attorneys; *Mr. O'Hagan* of counsel; *Barbara L. Birdsall* on the brief).

The opinion of the court was delivered by

SHEBELL, P.J.A.D.

Plaintiffs, Joseph P. Slowinski and Stacey C. Slowinski, filed an action in the Chancery Division to enjoin defendant, County of Monmouth, from implementing a road-widening of County Route 537 which passes in front of plaintiffs' eighteenth-century home. Defendant was granted summary judgment. Plaintiffs appeal the grant of summary judgment to the County, as well as the denial of plaintiffs' own motion for summary judgment. We affirm these rulings.

Plaintiffs filed a two-count complaint on August 25, 1990, seeking to restrain defendant from widening the existing thirty-two foot roadway which passes in front of their home and asking for a declaration that the Legislature's 1765 grant of a return for a sixty-six foot roadway is invalid. Before defendant answered, plaintiffs filed an amended complaint, the first two counts of which were identical to the original complaint. However, plaintiffs added a third count alleging that plaintiffs' property is in an historic district and that defendant should be restrained from any action until it has obtained a required permit from the Commissioner of Environmental Protection. Plaintiffs then, for the first time, requested a "trial by jury of all issues raised under Count Two of the Complaint. . . ."

Defendant answered the original complaint on November 9, 1989, asserting it had a valid and enforceable right to widen the roadway to sixty-six feet. In its answer to the amended complaint, defendant, on December 19, 1989, further asserted that it owned the property upon which the roadway would be widened so that no permit from the Commissioner would be required.

Plaintiffs, in January 1990, moved for summary judgment. This was denied by order of March 16, 1990. Plaintiffs filed a second amended complaint on September 24, 1990, repeating count one, restating as count two their earlier allegations regarding the need for a permit to encroach on land in an historic district, and asserting in counts three and four that, if anything were established in 1765, it was merely an easement which was superseded

by the Turnpike Act of 1866, leaving defendant with a road limited to the current thirty-two feet in width. It appears that plaintiffs failed to renew their jury demand in this complaint. Defendant's answer of October 26, 1990, denied the substance of the complaint.

On September 8, 1990, defendant moved for summary judgment. Plaintiffs cross-moved for summary judgment on December 11, 1990. Argument on these motions was heard on January 25, 1991. By order of February 27, 1991, the court granted partial summary judgment to defendant, declaring the road return recorded in 1765 (for a road sixty-six feet wide) valid and denying summary judgment relief to plaintiffs.

On November 8, 1991, plaintiffs sought reconsideration of the court's grant of partial summary judgment to defendant, followed by a brief in support of this relief, as well as in support of plaintiffs' demand for a jury trial. After argument on December 19, 1991, the court, by order of January 8, 1992, denied reconsideration and denied plaintiffs' demand for a jury.

Defendant, in April 1992, moved for summary judgment on all remaining issues. This was followed in May 1992, by plaintiffs' motion for summary judgment on all issues. After argument on July 2, 1992, the court entered its order of July 7, 1992, granting summary judgment to defendant and recognizing defendant's ownership of land thirty-three feet on either side of the center line of the existing road, County Route 537. The court's amended order of July 20, 1992, added denial of plaintiff's motion for summary judgment to the relief granted.

The pertinent facts surrounding this controversy are as follows. In 1760, the colonial General Assembly adopted "AN ACT for regulating Roads and Bridges," allowing the public, after notice, to establish public roads by survey and to take possession of such roads as public property. There was no provision for or requirement of compensation to affected property owners. A "return of a road," Number A–102, was recorded in September 1765, for the purpose of removing "a certain four Rod Road" in the Town of Shrewsbury "leading from John Polhemus' land to the Highway

Southerly of the Falls Mill...." The return asserted that the "old former road," to which the new return and road crossing would connect, "shall be and remain a public four rod road" (66 feet). A new road return, signed June 24, 1776, declared the 1765 return null and void and described the new road by survey description. This return further confirmed the road as "a publick four rod road." The 1766 return appears to have been judicially invalidated in 1767, as further appears herein.

In 1866, the Legislature passed an act to incorporate the Tinton Falls Turnpike Company to "construct and make a turnpike road in the county of Monmouth" which would be "on and along the public highway" with the authority to straighten out the roads where necessary by taking and paying compensation for necessary lands. The improved road was to be paid for by tolls and "constructed not to exceed thirty-two feet in width along the middle, as near as may be, of said highways." The Tinton Falls Turnpike Authority conveyed the turnpike to Monmouth County on June 11, 1901.

On December 12, 1985, plaintiffs contracted to purchase block 66, lots 10 and 11, in Tinton Falls from William and Gertrude Barrett. Prior to closing in April 1986, plaintiffs received a survey showing the County's road return A–102 extending thirty-three feet from the centerline of the existing road through the porch and near the house plaintiffs intended to purchase. In reply to plaintiffs' attorney, the County, by letter of April 25, 1986, stated that the County owned the sixty-six-foot area shown for the road return and would not pay compensation when and if the road were widened.

Plaintiffs negotiated a price reduction of $25,000 with the Barretts in return for agreeing to make no claims against the sellers and closed title on May 2, 1986. Their written agreement acknowledged the fact that the front entrance of the house encroached on the public right-of-way and recited that this "will reasonably require that the house located on the subject premises be relocated by the Buyer subsequent to closing."

Plaintiffs' property is located in an historic district and includes a barn believed to have housed a blacksmith's shop more than 200 years ago. Plaintiffs' deed conveyed to them lots 10 and 11 to the center of Monmouth County Route 537, locally named Tinton Avenue, subject to the County's rights in the road. Plaintiffs' title survey included both the existing roadway at fourteen and one-half feet from the road's centerline, as well as the County's right-of-way thirty-three feet from that centerline. The latter cuts through most of plaintiffs' porch and the existing front yard, placing the house on the curb line of the road if it is extended to maximum width.

The County's plans, drawn up in July 1988, show expansion of the bridge and widening of the roadway within the sixty-six-foot right-of-way but less than the full width. The County right-of-way goes through plaintiffs' front porch although the proposed widened roadway would actually be several yards away from the porch.

The chancery judge ruled that the County had a right-of-way to sixty-six feet, extending thirty-three feet from the centerline of the existing roadway, which was essentially the centerline of the roadway actually established before and after passage of the A–102 road return, and which was also the centerline of the 1866 turnpike road.

The judge, in making these findings, added that even if he were wrong and plaintiffs were right in asserting that the County was only entitled to the existing roadway, then plaintiffs were still not entitled to compensation for the additional taking. He reasoned:

I think there would be an equitable estoppel argument that would apply to that. And that is when the Slowinskis took title to their property. They got their survey. They recognized what we're talking about here; recognized that the survey showed the sixty-six foot width as coming very close to the porch; actually putting a bit of the porch off the house ... [and negotiated a $25,000 price reduction].

. . . .

So their property, if the County takes it, has not been taken without just compensation. In a sense, they were compensated privately for being burdened

with that at the time they took title. So, therefore, to claim if I'm wrong on the law in finding here that there was no abandonment of the public right-of-way to claim that there should be compensation for the use of it, I think would be a double-dipping, so to speak. It would be an unconscionable award to them.

Not only have they been paid by the sellers but then they turned around and start seeking payment from the County. And I think they'd be estopped from doing that, too.

We note that this ruling was an afterthought. In any event, we cannot subscribe to it. We find no case which supports the proposition that, where the purchaser received a price break in anticipation of possible condemnation of the land being purchased, the landowner is later estopped from asserting the constitutional right to compensation upon the happening of the condemnation. Equitable estoppel is imposed when the one to be estopped has induced the other party to act in reliance upon some misrepresentation or concealment of material facts unknown to the party claiming estoppel. *See Carlsen v. Masters, Mates & Pilots Pension Plan Trust,* 80 *N.J.* 334, 339, 403 *A.2d* 880 (1979). Similarly, courts will invoke their equitable powers to prevent a creditor from recovering a single debt twice from the same debtor. *Callano v. Oakwood Park Homes Corp.,* 91 *N.J.Super.* 105, 110, 219 *A.2d* 332 (App.Div.1966); *Wanamaker v. Perth Amboy Nat'l Bank,* 137 *N.J.Eq.* 301, 307, 44 *A.2d* 499 (Ch.1945).

The chancery judge's estoppel position is not viable because the County has no right to claim the benefit of the bargain made by plaintiffs. The County cannot be said to have made payment to anyone for the taking of any part of the property in question. Defendant had nothing to do with the negotiation of the purchase price between plaintiffs and the property sellers and can make no claim that the price reduction led the County to rely to its detriment.

Although we find no basis for application of the doctrine of estoppel in the record here, we do recognize that the plaintiffs took possession of their property with full knowledge of defendant's claims regarding the width of its road rights. Plaintiffs' contract with the sellers is demonstrative of the verifiable nature of the County's claim of right, as well as evidence of the lack of

surprise or unexpected hardship to the plaintiffs. Plaintiffs took possession of their property with full knowledge of defendant's claims regarding the width of its road rights.

We now turn to the judge's finding that the County's right-of-way was established over two hundred years ago in the position now occupied by Route 537 and that defendant's right-of-way remains to the full sixty-six feet. He concluded that the County owned the right to build the roadway to thirty-three feet from the existing centerline and plaintiffs need not be compensated as there was no taking of their property.

Plaintiffs' case rests, in principal part, on the proposition that their house stood in 1765 when the return A–102 was recorded and that the course of the return bisected their house. Such a bisection, they assert, would have rendered the return void. Therefore, the court should now find the return invalid and void, despite over two centuries of public usage of the road. It may well be that if plaintiffs' house were in existence when the return was recorded, then the house stood in the path of the return. Nonetheless, we do not find it error for the judge to have refused to determine whether the house stood in the path of A–102 in 1765. If plaintiffs were to prove that the house stood in the path of A–102, they would have demonstrated only that, under the case law, a challenge to the return would have succeeded at the time it was recorded, as a return which included courses which transected a house was subject to being held invalid. *Whittingham v. Hopkins*, 70 *N.J.L.* 322, 328, 57 *A.* 402 (E. & A.1904); *State v. Troth*, 36 *N.J.L.* 422, 424–25 (E. & A.1872); *State v. Hoffmeister*, 62 *N.J.L.* 565, 566, 41 *A.* 722 (S.Ct.1898); *State v. Brown*, 53 *N.J.L.* 181, 183, 20 *A.* 738 (S.Ct.1890).

The Road Act of 1760, under which A–102 was established, provides for the recording of roads:

two, three, or four Rods broad, as the Case may require, and shall be laid out to the best Conveniency of the Inhabitants of the adjacent Towns, Divisions or Precincts, and with as little Disadvantage, as conveniently may be, to the Owner or Owners of the Lands, by which any Road shall be laid out or run through according

as the aforesaid six Surveyors, or the major Part of them, shall think proper, and agree upon....
[Act of 1760.]

The recorded return for A–102 makes no mention of the house. It recognizes an existing road which the surveyors "do think it expedient and necessary to alter." The return runs several courses, down from Freehold toward Little Silver, along the property line of Van Mater until it runs along the *"Middletown Road as it now goes,"* as described by compass directions and chain lengths, until it crosses "the Millpond to the old former road *which shall be and remain a public four rod road."* (Emphasis added).

One year after A–102 was recorded, in 1766, the surveyors, upon application of Van Brunt, attempted to record an altered four rod road, designated as A–105, terminating at "the west end of the falls bridge where it now stands." However, it appears that a challenge to the second return, A–105, succeeded in the colonial "Supreme Court." Hand-written notes thereof reflect that the "Court having heard the Parties by their Council do Vacate the Return & location of the Survey last made & Order it become Null & Void to all intents and purposes whatsoever." Thus, A–105 was voided and, presumably, A–102 thereafter remained valid. Again, nothing in the course and description of A–105, indicates its course ran through the house. Notably, A–105 does recite that the previous four rod road established in September 1765, ran "eastward through said Van Brunts plantation to Middletown Road as it now goes thence southerly along said road to the falls bridge as it now stands...."

Plaintiffs and defendant agree that the road never ran as described in A–102 across plaintiffs' property in a straight line toward the bridge, but has always curved toward the bridge. Thus, it appears that the established road was never in accordance with the literal terms of A–102. Defendant maintains that the current road, substantially the same road as has existed since the recording of A–102, runs thirty-four feet west of the plotted course of A–102, *i.e.,* the recorded return would run thirty-four feet east

of the existing road. Plaintiffs contend that there was no road until 1765, at which time it was opened fifty-seven feet west of the recorded return, and that Route 537 now runs thirty-nine feet west of where A–102 would have gone. That is, the recorded return A–102 would run thirty-nine feet east of the existing road.

It is apparent that the road actually used by the public does not follow the recorded course of A–102. As the judge concluded, the road travelled by the public, instead of "jogging" on points (making sharp angular turns approaching the bridge), actually curved toward the bridge in a smooth arc, regardless of what the surveyors intended. The judge accepted the parties' underlying premise that the road has not followed the course of A–102 for two hundred years. Nonetheless, he upheld the validity of the return. *Cf. State v. French*, 24 *N.J.L.* 736, 739 (E. & A.1853) (shifting the road forty feet east of its described course is material and makes recorded return invalid); *State v. Burnet*, 14 *N.J.L.* 385, 386 (S.Ct. 1834) (material variance between return recorded and road laid out renders return invalid). Plaintiffs contend that the judge's failure to rule the return invalid was error. We need not consider this issue because we conclude that a public right-of-way of four rods was established in this "ancient road."

Colonial law took from English common law the right of the sovereign to take land for public purpose without compensation and the original New Jersey Constitution of 1776 includes no provision for compensation for public taking of private land. One of the great controversies in New Jersey leading up to the Revolution was the instability of land titles, with public riots and foment frequently causing the closing of courts in the middle of the eighteenth century. *See* Steven B. Presser, *An Introduction to the Legal History of Colonial New Jersey*, 7 *Rutgers–Camden Law Journal* 262, 341 (1976).

The *N.J. Const. of 1844* art. I, ¶ 16 provided that "[p]rivate property shall not be taken for public use, without just compensation; but land may be taken for public highways, as heretofore, until the legislature shall direct compensation to be made." *See*

·Valentine v. Lamont, 13 *N.J.* 569, 576–77, 100 *A.*2d 668 (1953), *cert. denied,* 347 *U.S.* 966, 74 *S.Ct.* 776, 98 *L.Ed.* 1108 (1954). Thus, a road taken for public use prior to at least 1844, required no compensation. *Lehigh Valley R.R. Co. v. McFarlan,* 31 *N.J.Eq.* 706, 709 (E. & A.1879); *Den v. The Morris Canal and Banking Co.,* 24 *N.J.L.* 587, 589–90 (E. & A.1854). Of course, compensation is now a matter of constitutional imperative. *N.J. Const.,* art. I, ¶ 20 ("[p]rivate property shall not be taken for public use without just compensation....").

■ The steps for creation of a public highway have been long established:

1—By a laying out according to the statute;

2—By the uninterrupted use and enjoyment by the public of the road as a highway for not less than 20 years without any circumstances to negative the intention to dedicate; and

3—By the actual dedication by the owner to the public as a highway.

[*Township of Parsippany–Troy Hills v. Victor Bowman,* 3 *N.J.* 97, 103–04, 69 *A.*2d 199 (1949) (quoting *Smith v. State,* 23 *N.J.L.* 712 (E. & A.1852)).]

A more recent decision affirming that these three methods are the means by which a public road is established is *Acken v. Campbell,* 134 *N.J.Super.* 481, 488, 342 *A.*2d 209 (App.Div.1974), *aff'd,* 67 *N.J.* 585, 342 *A.*2d 172 (1975). It is beyond dispute that the public has long enjoyed use of the road where it now runs. There is no evidence to negate its dedication for public use.

■ We conclude that the public right-of-way was established at four rods or sixty-six feet even though a lesser width has been used by the public. During the time of colonization, the matter of mapping and publicly maintaining roads in New Jersey was the subject of significant legislative action with statutes governing the laying and public taking of road returns being passed in 1682, 1716, 1758, 1760, and 1774. The primary effect of the early Acts was to confirm as public roads those six and four rod roads which had been laid out and ascertained by any earlier Acts and therefore, to confirm as public property these "ancient roads." *See Ward v. Folly,* 5 *N.J.L.* 482 (566), 484–85 (568–69) (S.Ct.1819). The Act passed by the General Assembly on March 11, 1774,

validated as public property "all Roads and Highways of six and four Rods broad, which have been laid out and ascertained by any Act or Acts of Assembly of this Colony, before the passing of this Act. . . ." The Act thereby confirmed earlier roads and highways, whether or not established by returns, and this included A–102.

Middletown Road was in use as a public road since colonial times. The two Morris deeds of 1750 refer to the Middletown Road as does a road return of 1705. Moreover, a 1676 map of Morris' lands hints that the road may have been in existence even at that early date. This road apparently connected the Falls River and the Swimming River and originally may have passed a substantial distance to the south of the lands presently in question. A four rod road was thereafter confirmed by the 1760 Act. This is reflected in the sixty-six-foot wide return of A–102 recorded in 1765. The new road, now crossing the river at a point further north, was not laid according to the return survey and it appears that when it was thereafter established it was actually travelled only to the width of thirty-two feet. However, the recorded sixty-six-foot return evidenced the width of the right-of-way. Thus, although the public used only half that width, it had a right-of-way to the full thirty-three feet on either side of the center of the road actually travelled. This is the width of the right-of-way recorded by the return and acknowledged in titles and surveys to the present time, albeit on a course different than the return. This status was thereafter confirmed by the 1774 Act.

In *Ward v. Folly, supra,* 5 *N.J.L.* at 485 (569), the former Supreme Court held that an ancient road "used as such since as far back as the memory of man can reach" would be found to be a four rod road despite the absence of a recorded return, by virtue of its use prior to 1760. The court held that the public had the right to expand its use to four rods to meet current needs, since "it would have been exceedingly inconvenient that the whole intercourse of the people should be interrupted or suspended merely because the roads happened not to be recorded, however long they might have been in public use." *Ibid.* We hold that the

road in question is an ancient road because it was in use prior to the confirming Act of 1774, and as a consequence continued as a confirmed public four rod road thereafter. Clearly, it was in existence at the time of the confirming Act of 1774. It, therefore, is presumptively a four rod road despite its lesser use. The fact that the recorded return of A–102 was not followed in its precise location would not affect the width of the right-of-way to which the public remains entitled.

■ We do not suggest that it can be established that the road was ever in use to its sixty-six-foot width. However, we do not consider the presumption of a four rod right-of-way to require that the full width of the right-of-way be actually utilized. What is significant in this case is that the sixty-six-foot right-of-way has been acknowledged for centuries. Plaintiffs were, at the time of purchase, on actual notice of its exact width and location. We find this distinction renders the holding in *Stackhouse v. Pemberton Borough*, 80 *N.J.Super.* 563, 194 *A.*2d 374 (Ch.Div.1963), inapplicable. The dedication in *Stackhouse* was "so uncertain and indefinite as to be virtually meaningless...." *Id.* at 568, 194 *A.*2d 374. This is not the case here.

The 1866 Turnpike Act provided for the Tinton Falls Turnpike Company to build a turnpike road that is now Route 537. The Act does not refer to the existing sixty-six feet right-of-way. It only states that the road shall be upon the existing public highway and constructed "not to exceed thirty-two feet in width along the middle, as near as may be, of said highways." This would not abrogate the existing right-of-way of sixty-six feet. We do not agree with plaintiffs that the language of the 1866 Act, when contrasted with the other Acts cited, indicates an intent to limit the right-of-way only to the maximum width recited in the Turnpike Act. There does not appear to be any reason why the Legislature would have intended to disadvantage the public interest by limiting the right-of-way to thirty-two feet, instead of the sixty-six feet previously granted and confirmed.

In *Board of Chosen Freeholders of the County of Passaic v. Cimorelli,* 22 *N.J.Super.* 275, 277, 91 *A.*2d 890 (Ch.Div.1952), the facts were similar to the present case except that there, the incorporating Act of 1806 explicitly gave the turnpike company a sixty-six foot right-of-way. The County sought to widen the existing thirty-foot road, which would have required removal of a portion to the plaintiff's building, since it stood along the existing road and approximately ten feet into the full sixty-six-foot right-of-way. *Id.* at 278, 91 *A.*2d 890. The plaintiffs asserted that it could not be conclusively proved that the existing road ran along the center of the 1806 turnpike and that use of only thirty feet for 146 years was an abandonment of the remaining twenty-six feet of the turnpike right-of-way. *Ibid.* The court held that:

> for upwards of 58 years Main Street, in the Borough of Bloomingdale, has been known and used as the Paterson–Hamburgh Turnpike. The county and borough, as well as the traveling public, have acted on that assumption. Under such circumstances the center line of Main Street will be presumed to be the true center line of the Paterson–Hamburgh Turnpike.
>
> Defendants also complain that there was no proof that the traveled portion of the highway ever exceeded 30 feet. Such proof was unnecessary.
>
> [*Id.* at 278–79 (citation omitted).]

In *Cimorelli, supra,* the incorporating act gave the turnpike company a sixty-six-foot right-of-way, whereas here the public already had a sixty-six-foot right-of-way prior to the 1866 Turnpike Act. As did the court in *Cimorelli,* we conclude that despite non-use of the full width for many years, the public easement extended thirty-three feet on either side of the centerline of the road.

Plaintiffs claim that, even if the County once had a sixty-six-foot right-of-way in the road, failure to use the full width has resulted in transfer of those rights to plaintiffs as the property owners. Although the road has never been used to a width exceeding the present width of just over thirty feet, we are convinced that on these facts, the right-of-way in the public was not lost by mere non-use. All were put on notice of the width of the right-of-way by reason of the recorded return of A–102. The failure to pave and use the full width of the right-of-way had no effect and the public is entitled to use or expand the road to the full width of

thirty-three feet on each of the centerline. *See Miller v. Pennsylvania–Reading Seashore Lines, Inc.,* 120 *N.J.L.* 172, 173–75, 198 *A.* 848 (E. & A.1938); *Opdycke v. Public Serv. Ry. Co.,* 78 *N.J.L.* 576, 582 (E. & A.1910); *Cimorelli, supra,* 22 *N.J.Super.* at 278, 91 *A.*2d 890.

Plaintiffs argue that the long-standing rule, that non-use does not forfeit a public right-of-way, has been altered by the Court's ruling in *Devins v. Borough of Bogota,* 124 *N.J.* 570, 579, 592 *A.*2d 199 (1991). The holding in *Devins* does not apply here. The public right to a sixty-six-foot right-of-way for the Middletown Road was gained by use and confirmed by statute and the recorded return. It was thereby dedicated to public purposes. The Court in *Devins* excepted from its ruling lands dedicated to public use. *Ibid.* Land dedicated for a public road is not lost simply from failure to pave the full width of the roadway. The land defendant seeks to use to widen the existing road is public land adjacent to the Middletown Road, now County Route 537, which the public uses every day. Sixty-six feet has been dedicated to this use.

Plaintiffs cite no cases to support its effort to regain a portion of the public right-of-way in the road simply because the road is not paved to its full dedicated width. Such a result would require a municipality or county to pave every road to its full dedicated width or risk a loss, despite current usage of a significant portion of the right-of-way. It is clear that land titles and municipal planning have long relied on the continued validity of the easement and right-of-way of sixty-six feet proclaimed to the public under the recorded A–102 return.

Plaintiffs contend, as they did at the summary judgment argument, that through their expert they would establish that, even if defendant gained a sixty-six-foot right-of-way by A–102, the road which formed the center of that right-of-way ran west of where Route 537 now runs. According to plaintiffs, the existing curb in front of plaintiffs' house is approximately thirty-three feet from the centerline of A–102 as it ran at the time the return was recorded in 1765.

Plaintiffs' contention in this regard rests on plotting deeds from the late eighteenth and early nineteenth centuries to show that the courses of these deeds, which ran along the road, were southwest of where the road now is. This would show a shifting of the road toward plaintiffs' house since then. Plaintiffs assert this probably happened when the turnpike road was established. However, the record is clear that neither plaintiffs nor anyone else at this time can determine with any certainty that A–102 had been opened other than where it is now.

The Chancery Division judge found that it was not materially disputed that the road has, since at least 1765, run where it now exists. The parties agree that Route 537 and the plotted course of A–102, as well as the turnpike road, all run essentially the same up to the "jog point," sometimes called the "hinge point." From that point, going towards plaintiffs' property, A–102 angles sharply south and then turns sharply west, while the turnpike and Route 537 curve southwest toward the bridge.

Defendant contends the road past the jog point has always followed its current course. Plaintiffs contend that the jog point is southwest of where defendant places it and that the road ran further west of plaintiffs' property due to the shift of the jog point. This is based upon plaintiffs' contention that deeds from 1797 and 1799 call to a road further west than the present location of Route 537, which they concede runs where the 1866 turnpike ran. The judge found that the hinge point asserted by the County had merit, since it was consistent with the accurate plotting of the majority of the old deeds and did not require realigning the historic location of properties bordering plaintiffs' land, which in any event plaintiffs contended shifted toward the existing road in the nineteenth century.

Plaintiffs' offer of proof concerning the shifting of the road prior to the Turnpike Act of 1866 did not create a material issue of fact. Not only was it speculative, but whether, around 1800, it was a little west of where Route 537 now runs or whether it later took a

course closer to plaintiffs' house, plaintiffs agree that the road established by the Turnpike Act ran where Route 537 now runs. Unquestionably, the bridge has been in the same place since 1765. As the judge noted, Route 537 has been where it is for a very long time. Indeed, the court found no reasonable dispute as to the curve and location of the road, since 1765 until today. The shifting of the roadway prior to 1866, even if in accordance with plaintiffs' assertions, is not material since the course of the turnpike road according to the 1866 Turnpike Act followed the "public highway" and the turnpike road is acknowledged to have been where Route 537 now runs. We hold this right-of-way to be sixty-six feet wide.

Plaintiffs took title with full knowledge of the fact that the width of the right-of-way for county Route 537 as it passed their home was sixty-six feet. They even acknowledged that it encroached to such an extent that the home would have to be relocated subsequent to closing. In these circumstances, they have no right to relief in Law or in Equity.

Affirmed.